1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ROSA KWAN, et al.,

              Plaintiffs,

        v.

CLEARWIRE CORPORATION, et
al.,

              Defendants.

CASE NO. C09-1392JLR

ORDER

## I.   INTRODUCTION

Before the court are the following motions:  (1) Defendants Clearwire

Corporation, Clearwire Communications LLC, and Clearwire US LLC's (collectively

"Clearwire") motion to compel arbitration and to stay Plaintiffs' action (Dkt. # 127),

(2) Defendant Bureau of Recovery's ("BOR") motion to compel arbitration and to stay

Plaintiffs' action (Dkt. # 126), and (3) Plaintiffs' motion to defer the court's ruling with

respect to arbitration pending further discovery (Dkt. # 153).  Having reviewed the

ORDER- 1

motions, all papers filed in support or opposition thereto, and the governing law, and being fully advised, the court DENIES Clearwire's and BOR's motions to compel arbitration without prejudice because there are issues of fact with respect to these motions which require an evidentiary hearing pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4.  The court further DENIES Plaintiffs' motion to defer the court's ruling with respect to arbitration as MOOT.[1]

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Rosa Kwan is not a Clearwire customer, but she alleges that she was mistakenly and repeatedly called by Clearwire and/or its collection agency vendors in their efforts to reach a Clearwire customer with an overdue account.  (3rd Am. Compl. (Dkt. # 38).)  Ms. Kwan brought a putative class action complaint against Clearwire and its collection agency vendors for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)A)(iii), the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692(d)(5), (d)(6) & (e)(14), civil conspiracy, Washington's Consumer Protection Act, RCW ch. 19.86, *et seq.*, and other claims.[2]  (*Id.*)

On February 1, 2011, Ms. Kwan amended her complaint to add Plaintiffs Amber Brown and Heather Reasonover, who allegedly are or have been customers of Clearwire.  (4th Am. Compl. (Dkt. # 111).)  Ms. Brown and Ms. Reasonover also allege that they

_____

[1] No party requested oral argument, and the court deems these motions appropriate for decision without it.

[2] Clearwire has admitted that "Ms. Kwan was never a Clearwire customer but was mistakenly called in efforts to reach a Clearwire customer with a past-due amount."

ORDER- 2

1   were repeatedly called by Defendants, and have sued Defendants on largely the same

2   grounds as Ms. Kwan.  (*Id.*)  In response to the addition of Ms. Brown and Ms.

3   Reasonover as plaintiffs, Defendants Clearwire and BOR filed separate motions to

4   compel arbitration of the new plaintiffs' claims.  (Clearwire Mot. (Dkt. # 127); BOR Mot.

5   (Dkt. # 126).)

6        In May 2009, Ms. Brown elected to obtain mobile internet service from Clearwire

7   for a 14 day trial period.[3]  (4th Am. Compl. (Dkt. # 111) ¶ 2.3.)  In late 2009 or early

8   2010, Ms. Reasonover elected to obtain mobile internet service from Clearwire for a trial

9   period of seven business days.[4]  (*Id.* ¶ 2.15.)  Clearwire asserts that before using

10  Clearwire's service or equipment, Clearwire requires its customers to agree to

11  Clearwire's Terms of Service ("TOS").  (Camacho Decl. ¶ 4.)  Generally, Clearwire

12  asserts that its standard business practices "ensure that customers have the opportunity to

13  read the TOS before they sign up, before they receive equipment from Clearwire, before

14  they use Clearwire equipment, and before they are able to access the internet through

15  their Clearwire service."  (*Id.*)

16       Clearwire asserts that the TOS applicable to Ms. Reasonover and Ms. Brown's

17  claims contains the following clause:

18       This is an agreement between you and [Clearwire].  By using Clearwire's
         wireless broadband internet access service . . . or any equipment purchased
19

20       [3] Consistent with Plaintiffs' allegations, Clearwire asserts that Ms. Brown signed up for
21   Clearwire service on May 15, 2009.  (Camacho Decl. (Dkt. # 128) ¶ 5.)

22       [4] Consistent with Plaintiffs' allegations, Clearwire asserts that Ms. Reasonover signed up
     for Clearwire service on January 21, 2010.  (Camacho Decl. ¶ 5.)

ORDER- 3

or leased by you from Clearwire . . . you agree to be bound by and comply with the following terms and conditions.

(Camacho Decl. ¶¶ 5-6 & Ex B (introductory paragraph; original in capital and bolded lettering); *see also id.* Ex. A (which contains substantially similar language).)  One the terms of the TOS is an arbitration clause, which reads as follows:

Arbitration . . . and class action waiver. . . . All disputes arising under this agreement . . . will be settled exclusively by binding arbitration using the commercial rules of American Arbitration Association ("AAA") then in effect.  The place for arbitration will be in the state where the service is provided. . . . The decisions of the arbitrator will be binding and conclusive upon all parties involved . . . . You and Clearwire waive any right to trial by jury of any claims or disputes relating to this agreement or the service or equipment.  Neither party shall, and each party waives any right to, participate in a class action (including any class arbitration). . . .

(*Id.* Exs. A ¶ 26 & B ¶ 26 (original in capital and bolded lettering).)

Clearwire asserts that it sent order confirmation emails to both Ms. Brown and Ms. Reasonover which included a link to the TOS and prominent references to key TOS provisions such as the arbitration clause.  (*Id.* ¶ 5.)  The court notes, however, that the confirmation email submitted by Clearwire contains only a general link to Clearwire's homepage at www.clearwire.com, and not a direct link to its TOS.  (*See id.*)

Plaintiffs have submitted evidence that Clearwire's homepage (at www.clearwire.com), however, makes no reference to the TOS.  (Williamson Decl. (Dkt. # 133) ¶ 2 & Ex. A.)  When one scrolls to the bottom of the homepage, there is a list of terms or links, which includes a link for "legal."  (*See id.*)  If one clicks on the "legal" link, a second webpage appears which lists various other links alphabetically, including the TOS, which is found by scrolling to the bottom half of the second webpage.  (*See id.*)

ORDER- 4

1   To view the TOS, one must then click on the link marked "terms of service," which pulls

2   up a third webpage containing the TOS.  (*See id.*)

3       Ms. Brown has admitted that she received Clearwire's confirmation email on May

4   18, 2009.  (Brown Decl. (Dkt. # 131) ¶ 4 & Ex. A.)  Ms. Brown, however, notes that the

5   references to the TOS and its provisions occurred on the third page of the email.  (*Id.* ¶

6   5.)  She testifies that she "probably did not notice or read this third page of the email."

7   (*Id.*)  She further testifies that if she had, she "would not have expected it to foreclose

8   [her] class action claims or compel [her] to arbitrate them."  (*Id.*)

9       Ms. Brown has testified that her Clearwire modem arrived the week after she

10  received her May 18, 2009 confirmation email.  (Brown Decl. ¶ 5.)  Clearwire asserts that

11  its records confirm that Ms. Brown assented to the TOS before she accessed the internet

12  with her Clearwire modem on May 27, 2009.  (Camache Decl. ¶ 5; Supp. Camache Decl.

13  (Dkt. # 142) ¶ 5 & Ex. C.)  Specifically, Clearwire has presented copies of business

14  records that it contends confirm that Ms. Brown "clicked an acknowledgement stating

15  that she had read and agreed to the TOS, which accompanied [Clearwire's] 'I accept

16  terms' page."  (Supp. Camacho Decl ¶ 5.)

17      Ms. Brown, however, disputes this fact.  (Brown Decl. ¶ 6 ("I was never presented

18  with an "I accept terms" page when attempting to connect the modem.").)  She states that

19  when she attempted to connect her modem, she could not get it to operate properly in her

20  home.  (*Id.*)  She testifies that she was not required to click an acknowledgement on

21  Clearwire's website before or after she attempted to get her modem working.  (*Id.*)  She

22  further testifies that she called Clearwire to cancel her service, but was persuaded by a

1   Clearwire representative to allow a Clearwire technician to come to her home to check

2   the modem connection.  (*Id.*)  She agreed with the proviso that her 14-day trial period

3   would be renewed after the service call.  (*Id.*)

4          Clearwire's technician arrived at Ms. Brown's home on May 27, 2009, which is

5   the same day that Clearwire asserts Ms. Brown "clicked an acknowledgement stating that

6   she read and agreed to the TOS, which accompanied the 'I accept terms' page." (Supp.

7   Camache Decl. ¶ 5 & Ex. E.)  Ms. Brown has testified, however, that she was at work

8   when the technician arrived and that her roommate let the technician in her home.

9   (Brown Decl. ¶ 6.)  The parties have stipulated that an issue of fact exists with regard to

10  whether Ms. Brown logged in and consented to the TOS on May 27, 2009.[5]  (Stip. (Dkt.

11  # 146) ¶ 6.)

12         Ms. Brown has testified that, following the technician's visit, she discovered that

13  use of her microwave oven interfered with her modem signal, and that Clearwire's

14  modem still did not work properly in her home.  (*See id.*)  Ms. Brown has testified that

15  she called Clearwire customer service again with the intent to cancel the service.  (*Id.* ¶

16  7.)  Clearwire initially told Ms. Brown that her trial period was over, and that she owed

17  Clearwire for the service.[6]  (*Id.*)  After speaking with three Clearwire representatives,

18

19

20         [5] The parties have also stipulated that the court should consider the TOS assent pages
       attached as Exhibts A and B to the Supplemental Camacho Declaration as examples of what
21     Clearwrie's TOS assent pages looked like during the relevant time periods but not as copies of
       what Ms. Brown and Ms. Reasonover actually viewed.  (Stip. ¶ 6.)

22         [6] Ms. Brown asserts that Clearwire agreed to a 14-day extension of the trial period
       following the technician's May 27, 2009 visit.  (Brown Decl. ¶6.)  Clearwire asserts that it only

1  Clearwire finally agreed that Ms. Brown was still in the trial period, and could cancel her

2  service.  (*Id.*)

3      Ms. Brown has testified that Clearwire agreed to email her a shipping label for

4  return of the modem.  (*Id.* ¶ 7 & Ex. C.)  Ms. Brown has testified that Clearwire emailed

5  shipping labels to her on three occasions, but she was unable to print any shipping labels

6  that Clearwire sent to her via email.  (*Id.* ¶ 7; *see also* Supp. Camache Decl. ¶ 14..)

7  Clearwire asserts that Ms. Brown was unable to print these shipping labels because by the

8  time she attempted to print them the labels had expired.  (Supp. Camache Decl. ¶ 13.)

9  Ms. Brown also has testified that she asked Clearwire if she could just return the modem

10  to a Clearwire dealer since there was one within two blocks of her home, but Clearwire

11  refused.  (Brown Decl. ¶ 8.)

12      In any event, Ms. Brown has testified that on or about December 31, 2009, she

13  spoke with a Clearwire representative who offered to mail her a shipping label to return

14  the modem.  (*Id.* ¶ 13.)  Ms. Brown received the shipping label in the mail sometime on

15  or after January 4, 2010.  (*See id.* ¶¶ 13-14.)  After receiving the shipping label in the

16  mail, Ms. Brown shipped the modem back to Clearwire, and Clearwire received it on

17  January 14, 2010.  (Supp. Camache Decl. ¶ 14 & Ex. K.)

18

19

20

21

22

agreed to a seven day extension, and that Ms. Brown's June 3, 2009 call to cancel her service was therefore after her seven day extension of the trial period had expired.  (Supp. Camache Decl. ¶ 10.)  The court, however, has counted the days on the calendar several times to confirm that June 3, 2009 is indeed the seventh day following May 27, 2009.  Thus, it appears to the court that, even assuming Ms. Brown's trial period was extended for only seven (and not 14) days, she called to cancel within her extended trial period.  In any event, the factual issue is not material to any legal issue the court is asked to resolve in these motions.

1    In late 2009 or early 2010, Ms. Reasonover contacted a Clearwire representative

2  concerning an offer to obtain mobile internet service from Clearwire for a seven day trial

3  period.  (Reasonover Decl. (Dkt. # 132) ¶¶ 3-4.)  Ms. Reasonover has testified that the

4  Clearwire sales agent made no mention of a contract or accepting terms and conditions,

5  and assured her that she could cancel at any time.  (*Id.*)  Clearwire shipped a modem to

6  Ms. Reasonover, but it arrived on a work day when she was not present to accept the

7  package.  (*Id.* ¶ 5.)  Due to her work travel schedule, she was unable to pick it up from

8  Federal Express until after the seven day trial period had expired.  (*Id.*)  Ms. Reasonover

9  has testified that she realized that because it was impossible for her to return the modem

10  within the seven day trial period, she would be obligated to pay for the modem and for

11  the first month of service.  (*Id.*)

12    Clearwire sends written "materials" with its modems.  (*See* Supp. Camacho Decl.

13  ¶ 7.)  There is no indication in the record concerning the volume of these materials or the

14  manner of their presentation.  Ms. Reasonover's written testimony indicates that she

15  reviewed at least some of the materials that accompanied her modem.  (*See* Reasonover

16  Decl. ¶ 6.)  Clearwire has presented evidence that part of the materials it sends with its

17  modems includes that following excerpt:

18      You can review our terms of service at
        http://www.clear.com/company/legal/main.htm.  By activating or using our
19      service or equipment, you agree to be bound by the terms and conditions set
        forth at www.clear.com.  Please read the terms and conditions and policies
20      carefully as they among other things, establish your liability for the
        equipment, require term commitments, and require mandatory arbitration of
21      disputes.

22

ORDER- 8

1  (Supp. Camacho Decl. Ex. D.)  The court notes that this provision is set forth at the

2  bottom of a page entitled "Welcome!" and is set forth in smaller type than the rest of the

3  page.   As noted above, neither internet address provided in the above excerpt

4  immediately displays the TOS.  The first link requires the user to scroll to the second half

5  of the webpage and find the link "Terms of Service."  (*See* Williamson Decl. ¶ 2 & Ex.

6  A.)  If this hyperlink is clicked, then the TOS appears on the next webpage.  (*See id.*)

7  The second link requires a user to click on two additional hyperlinks to find the TOS.

8  (*See id.*)

9         When Ms. Reasonover plugged in the modem she received from Clearwire, she

10  was only able to obtain "one green bar," which indicates a weak modem signal, and she

11  only obtained this minimal signal at one inconvenient location in her house.  (*See*

12  Reasonover Decl. ¶ 6.)  Before connecting to the internet, Ms. Reasonover was presented

13  with Clearwire's "I accept terms" page.  (*Id.* ¶ 7.)  Ms. Reasonover, however, has

14  testified that she abandoned this page, deciding not to accept the terms and conditions.

15  (*Id.*)  She has testified that she "did not under any circumstances agree to a contract."

16  (*Id.*)  Clearwire asserts that Ms. Reasonover accessed the TOS acknowledgement page

17  (Supp. Camache Decl. ¶ 15), but provides no evidence that she ever clicked on the "I

18  accept terms" page.  Ms. Reasonover decided instead to contact Clearwire to discuss the

19  low signal.  (*Id.*)  She has testified that she spent an hour on the telephone with several

20  different Clearwire representatives, but decided to cancel her service and so informed a

21  Clearwire representative.  (*Id.* ¶ 8.)

22

1    Ms. Reasonover has testified that the Clearwrie representative told her that she

2    could not cancel her service because she had automatically signed up for one year of

3    service as part of the "special" offer.  (*Id.* ¶ 9.)  When she asked to speak to a supervisor,

4    the Clearwire agent hung up on her.  (*Id.*)  Ms. Reasonover filed a complaint with the

5    Better Business Bureau and also reported Clearwire's actions to American Express which

6    blocked further charges that Clearwire attempted to make to Ms. Reasonover's account.

7    (*Id.*)  Ms. Reasonover has testified that she never received internet service from

8    Clearwire.  (*Id.* ¶ 10.)  She also testified that Clearwire refused to accept the return of its

9    modem, and that she paid for it.  (*Id.* ¶ 13.)   Clearwire has denied that Ms. Reasonover

10   ever paid for her modem (Stip. ¶ 5), but admits that this is an issue of fact yet to be

11   determined.  (*Id.* ¶ 6.)

12       Both Clearwire and BOR have moved to compel arbitration pursuant to

13   Clearwire's TOS.  (*See* Clearwire Mot.; BOR Mot.)  Ms. Brown and Ms. Reasonover

14   argue, among other things, that they did not agree to Clearwire's TOS, and thus cannot be

15   bound by the arbitration provision contained therein.  (Resp. to Clearwire Mot. (Dkt. #

16   129) at 2-4.)  In addition, Ms. Brown and Ms. Reasonover assert that BOR acted as an

17   independent contractor and not an agent of Clearwire, and therefore, BOR cannot enforce

18   the arbitration clause with respect to their claims.  (Resp to BOR Mot. (Dkt. # 130) at 4-

19   13.)  Ms. Brown and Ms. Reasonover have also moved to defer the court's ruling on

20   arbitration until the parties have conducted further discovery.  (*See* Plaint. Mot. (Dkt. #

21   153).)

22

1                         **III.   ANALYSIS**

2     **A.  Standards and Choice of Law**

3         The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate

4 disputes arising out of transactions involving interstate commerce "shall be valid,

5 irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

6 revocation of any contract."  9 U.S.C. § 2.  The FAA allows "a party aggrieved by the

7 alleged failure, neglect, or refusal of another to arbitrate under a written agreement for

8 arbitration [to] petition any United States district court . . . for an order directing that such

9 arbitration proceed in the manner provided for in such agreement.  9 U.S.C. § 4.

10         It is well settled, however, that a court may not compel arbitration until it has first

11 resolved whether a valid arbitration agreement exists.  *Lifescan, Inc. v. Premier Diabetic*

12 *Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).  "[A]rbitration is a matter of contract

13 and a party cannot be required to submit to arbitration any dispute which he has not

14 agreed so to submit."  *AT & T Techs., Inc. v. Communications Workers of Am.*, 475 U.S.

15 643, 648 (1986) (quotation marks omitted).

16         The party seeking to enforce an arbitration agreement bears the burden of showing

17 that the agreement exists and that its terms bind the other party.  *See, e.g.*, *Sanford v.*

18 *Memberworks, Inc.,* 483 F.3d 956, 962 (9th Cir. 2007); *Three Valleys Mun. Water Dist. v.*

19 *E.F. Hutton & Co.*, 925 F.2d 1136, 1139-41 (9th Cir. 1991); *see also Opals on Ice*

20 *Lingerie v. Bodylines, Inc.*, 320 F.3d 362 (2d Cir. 2003) (holding that arbitration clause of

21 a contract was unenforceable because party seeking to enforce it had not shown that a

22 lawful contract had been created).  This burden is a substantial one:

Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect. . . . The district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made between the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise.

*Three Valleys Mun. Water Dist.*, 925 F.2d at 1141 (citing *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3rd Cir. 1980)).  Accordingly, the court must give Ms. Brown and Ms. Reasonover the benefit of all reasonable doubts and inferences with regard to Clearwire's and BOR's motions.

The general rule in interpreting an arbitration agreement is that courts "should apply ordinary state-law principles that govern formation of contracts."  *Cape Flattery Ltd. v. Titan Maritime, LLC*, 647 F.3d 914, 920 (9th Cir. 2011) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)); *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003).  Therefore, state law governs the question of whether the parties in the present matter entered into an agreement to arbitrate disputes relating to the provision of Clearwire's service or products.  In determining which state law controls, the court applies the choice-of-law rules of the forum state.  *See Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 994 (9th Cir. 2010); *Hines v. Overstock.com, Inc.,* 668 F. Supp. 2d 362, 366 (E.D.N.Y. 2009).

Washington applies the most significant relationship test.  *McKee v. AT&T Corp.*, 191 P.3d 845, 851-52 (Wash. 2008).  Applying this test, Washington courts have applied Washington law to a consumer contract, where Washington is the place of contracting, the place of negotiation (what little there is), the place of performance, the location of the

ORDER- 12

subject matter, and the residence of one of the parties – the consumer.  *Id.*  The court

concludes that Washington courts would apply Washington law with respect to the

contract formation issues involving Ms. Brown, and Texas law with respect to the

contract formation issues involving Ms. Reasonover.

### B. Clearwire's Motion to Compel Arbitration

It is a basic tenet of contract law, in either Washington or Texas, that in order to be

binding, a contract requires a "meeting of the minds" and "a manifestation of mutual

assent."  *See, e.g.*, *Discover Bank v. Ray*, 162 P.3d 1131, 1132 (Wash. Ct. App. 2007)

("In order to form a valid contract, there must be an objective manifestation of mutual

assent.") (citing *Keystone Land & Dev. Co. v. Xerox* 94 P.3d 945, 949 (Wash. 2004)); *In*

*re Marriage of Obaidi and Qayoum*, 226 P.3d 787, 791 (Wash. App. 2010) ("A valid

contract requires a meeting of the minds on the essential terms."); *Southwest Airlines, Co.*

*v. Boardfirst, LLC*, No. 3:06-CV-0891-B, 2007 WL 4823761, at * 4 (N.D. Tex. Sept. 12,

2007) ("For a contract to exist, the parties must manifest their mutual assent to be bound

by it") (discussing Texas contract law and citing *Alliance Milling Co. v. Eaton*, 25 S.W.

614, 616 (Tex. 1894)); *Sacks v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) ("A meeting of

the minds is necessary to form a binding contract.").  "The making of contracts over the

internet 'has not fundamentally changed the principles of contract law.'"  *Hines*, 668 F.

Supp. 2d at 366 (quoting *Register.com, Inc. v. Verio*, 356 F.3d 393, 403 (2d Cir. 2004)).

One primary means of forming contracts on the internet are so-called "clickwrap"

(or "click-through") agreements, in which website users typically click an "I agree" box

after being presented with a list of terms and conditions of use.  *Overstock*, 668 F. Supp.

ORDER- 13

2d at 366.  Click-wrap agreements derive their name by analogy to "shrinkwrap" used in

the licensing of tangible forms of software sold in packages.  *Specht v. Netscape*

*Comm'ns Corp.*, 306 F.3d 17, 22 n.4 (2d Cir. 2002) (Sotomayor, J.).  "Just as breaking

the shrinkwrap seal and using the enclosed computer program after encountering notice

of the existence of governing license terms has been deemed by some courts to constitute

assent to those terms in the context of tangible software, . . . so clicking on a webpage's

clickwrap button after receiving notice of the existence of license terms has been held by

some courts to manifest an Internet user's assent to terms governing the use of

downloadable intangible software. . . ."  *Id.* (internal citation omitted).

In addition to clickwrap agreements, "browsewrap" agreements have arisen as

another means of contracting on the internet.  *Overstock*, 668 F. Supp. 2d at 366.  In a

browsewrap agreement, the terms and conditions of use for a website or other

downloadable product are posted on the website typically as a hyperlink at the bottom of

the screen.  *Id.*  Unlike a clickwrap agreement, where the user must manifest assent to the

terms and conditions by clicking on an "I agree" box, a browsewrap agreement does not

require this type of express manifestation of assent.  *Id.*  Rather, a party instead gives his

or her assent by simply using the product – such as by entering the website or

downloading software.  *See id.*  In ruling upon the validity of browsewrap agreements,

courts primarily consider whether a website user has actual or constructive notice of the

terms and conditions prior to using the website or other product.  *Id.* (citing *Specht*, 306

F.3d at 20 (finding insufficient notice)).  Elements of shrinkwrap, clickwrap and

browsewrap agreements are at issue here.

1    In the seminal decision of *Specht v. Netscape Comms. Corp.*,[7] the Second Circuit

2    held that internet users did not have reasonable notice of the terms in an online

3    browsewrap agreement and therefore did not assent to the agreement under the facts

4    presented to the court.   306 F.3d at 20, 31.   In *Specht*, users of a website were urged to

5    click on a button to download free software.   *Id.* at 23, 32.   There was no visible

6    indication that clicking on the button meant that the user agreed to the terms and

7    conditions of a proposed contract that contained an arbitration clause.   *Id.*   The only

8    reference to the terms was located in text visible if the users scrolled down to the next

9    screen, which was "submerged."   *Id.* at 23, 31-32.   Even if a user did scroll down, the

10   terms were not immediately displayed.   *Id.* at 23.   Users would have to clink on a

11   hyperlink, which would take them to a separate webpage entitled "License & Support

12   Agreements."   *Id.* at 23-24.   Only on that webpage was a user informed that the user must

13   agree to the license terms before downloading a product.   *Id.* at 24.   The user would have

14   to choose from a list of licensing agreements and again click on another hyperlink in

15   order to see the applicable terms and conditions.   *Id.*   The Second Circuit concluded on

16   these facts that there was not sufficient or reasonably conspicuous notice of the terms that

17   the plaintiffs could have manifested assent to the terms under these conditions.   *Id.* at 32,

18   35.   The Second Circuit, however, was careful to distinguish the method just described

19   from clickwrap agreements, which do provide sufficient notice.   *Id.* at 22 n. 4, 32-33.

20

21   _____

22        [7] *Specht* was drafted by Justice Sotomayor while she was a circuit court judge.

ORDER- 15

1    Significantly, in *Register.com, Inc. v. Verio*, 356 F.3d 393 (2d Cir. 2004), the

2    Second Circuit distinguished *Specht* on the basis that the facts in *Specht* "did not compel

3    the conclusion that its downloaders took the software subject to those terms because there

4    was no way to determine that any downloader had seen the terms of the offer." *Id.* at

5    402. In *Register.com*, the facts were crucially distinguishable from *Specht* because the

6    *Register.com* user saw the terms of the offer and admitted that it was aware of the terms

7    of the offer. *Id.* The Second Circuit held that, where a plaintiff knew of the terms of the

8    offer, there was no reason why enforceability of the terms should depend on whether the

9    plaintiff was offered an "I agree" button to click. *Id.* at 403.

10    In considering the validity of clickwrap or browsewrap agreements, Texas courts

11    are in sync with the general guidelines established by the Second Circuit in its two

12    seminal decisions concerning this area of law. Texas courts have upheld the validity of

13    clickwrap agreements. *See, e.g.*, *Recursion Software, Inc. v. Interactive Intelligence, Inc.*,

14    425 F. Supp. 2d 756, 782-83 (N.D. Tex. 2006) (citing *Barnett v. Network Solutions*, 38

15    S.W.3d 200, 204 (Tex. App. Eastland 2001, pet. denied) (upholding a forum selection

16    clause in an online contract that required users to scroll through the terms and conditions

17    before clicking to accept or reject them)). However, central to the *Barnett* court's

18    holding was the fact that the user was conspicuously presented with the agreement prior

19    to clicking assent. *Barnett*, 38 S.W.3d at 204; *see also Realpage, Inc. v. EPS, Inc.*, 560 F.

20    Supp. 2d 539, 545 (E.D. Tex. 2007). In addition, at least one federal district court in

21    Texas applying Texas contract law has upheld a browsewrap agreement, but only where

22    the user admitted that it was aware of the terms the other party had placed upon use of the

1  product and that by using the product for its own marketing opportunities it was violating

2  those restrictions.  *See Southwest Airlines*, 2007 WL 4823761, at *5-*7.

3         The court has not identified any clickwrap or browsewrap cases decided by

4  Washington courts.  Washington courts, however, have upheld the validity of shrinkwrap

5  agreements.  In *Mortenson Co. v. Timberline Software*, 998 P.2d 305 (Wash. 2000), the

6  Washington Supreme Court held that shrinkwrap agreements are valid, and the terms

7  contained within them are enforceable, because the purchaser accepts the terms when it

8  uses the product.  The *Mortenson* court expressly noted that "[t]he terms were included

9  within the shrinkwrap packaging of each copy of [the product]." *Id.* at 313.  In upholding

10 the formation of the shrinkwrap contract, the *Mortenson* court relied heavily upon the

11 rulings in *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147 (7th Cir. 1997) and *ProCD v.

12 Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996).  *Mortenson*, 998 P.3d at 312-13.

13        In *ProCD*, the court upheld the validity of a shrinkwrap contract where a

14 consumer purchased a software database program at a retail store, with a license enclosed

15 in the package limiting the software's use to non-commercial applications. The software

16 also required a user to accept the license agreement by clicking an on-screen button

17 before activating the software.  The court found that ProCD proposed a contract that

18 invited acceptance by using the software after having an opportunity to review the

19 license.  If the buyer disagreed with the terms of the contract, he or she could return the

20 software.  Holding that the consumer was bound by the terms of the license agreement,

21 the *ProCD* court stated that "[n]otice on the outside, terms on the inside, and a right to

22 return the software for a refund if the terms are unacceptable (a right the license expressly

1  extends), may be a means of doing business valuable to buyers and sellers alike."

2  *ProCD*, 86 F.3d at 1451.

3        In *Hill*, a consumer ordered a Gateway computer over the telephone.  When the

4  computer arrived, the box contained Gateway's standard terms governing the sale.

5  According to Gateway's standard terms, the consumer accepted the terms by retaining the

6  computer for 30 days.  When the consumer was not satisfied with the operation of the

7  computer, he sued Gateway on behalf of a class of similarly situated consumers.  Relying

8  on the *ProCD* court's analysis that the vendor is the master of the offer, the *Hill* court

9  enforced the arbitration clause found in Gateway's standard terms even though the

10  consumer was not aware of the terms until he received the computer.  *Hill*, 105 F.3d at

11  1150.

12        Central to each court's analysis in *Mortenson*, *ProCD*, and *Hill* was the fact that

13  the terms and conditions at issue were included with the product purchased by the

14  consumer.  Thus, similar to the Second Circuit's analysis in *Specht* and *Register.com*, the

15  central issue of concern in Washington in determining whether or not a consumer is

16  bound by an alleged contract is whether the consumer has notice of and access to the

17  terms and conditions of the contract prior to the conduct which allegedly indicates his or

18  her assent.

19        The court now turns to the specific facts pertinent to the alleged contracts formed

20  by Ms. Brown and Ms. Reasonover.  Clearwire asserts that Ms. Brown assented to its

21  TOS both (1) by using her modem after having received the confirmation email which

22  noted the TOS on its website and then retaining the modem for six months, and (2) by

1   clicking on its "I accept terms" web-button prior to accessing the internet on her modem.

2   (Clearwire Mot. at 14.)  Ms. Brown admits that she received an email confirmation of her

3   telephone order from Clearwire.  However, as the court noted above, the confirmation

4   email did not contain a direct link to Clearwire's TOS, but rather a link to Clearwire's

5   homepage.  To find the TOS, Ms. Brown would have had to negotiate her way through

6   two more hyperlinks.  Further, the reference to the TOS did not appear until the third

7   page of the email Ms. Brown received.  Like the court in *Specht*, this court finds that the

8   breadcrumbs left by Clearwire to lead Ms. Brown to its TOS did not constitute sufficient

9   or reasonably conspicuous notice of the TOS.  Accordingly, the court declines to hold

10  that Ms. Brown manifested assent to the TOS based on her receipt of Clearwire's email

11  and retention of the modem alone.  Further, the court notes that Ms. Brown did in fact

12  ultimately return her modem to Clearwire.

13         Nevertheless, Clearwire asserts that it has business records confirming that Ms.

14  Brown "clicked" on an "I accept terms" button on its website prior to accessing the

15  internet with her modem.  Assuming she did, Ms. Brown would be bound by the TOS.

16  Ms. Brown, however, denies that she ever clicked such a button.  The court notes that the

17  same day that Clearwire asserts that Ms. Brown clicked on the "I accept terms" button, a

18  Clearwire technician visited her home, while she was not there, to check the modem

19  connection.  The parties have expressly stipulated that a material issue of fact exists with

20  respect to whether or not Ms. Brown ever clicked Clearwire's "I accept terms" button.

21  Accordingly, the court denies Clearwire's motion to compel arbitration without prejudice

22  with respect to Ms. Brown.

ORDER- 19

1    Because the parties have stipulated to the existence of a genuine issue of material

2    fact concerning whether Ms. Brown assented to the arbitration clause contained with the

3    TOS by clicking on the "I accept terms" button on Clearwire's website, the court is

4    required to "proceed summarily to a trial thereof." 9 U.S.C. § 4.  Accordingly, the court

5    will schedule the required evidentiary hearing with respect to the factual issue of Ms.

6    Brown's assent to the TOS as indicated further below.

7    Clearwire has presented no evidence that Ms. Resaonover ever clicked on its "I

8    accept terms" button.  Indeed, Ms. Reasonover has testified that when she was presented

9    with this webpage, she abandoned the page, specifically deciding not to accept the TOS.

10   (Reasonover Decl. ¶ 7.)  Clearwire's argument that Ms. Reasonover has assented to its

11   TOS is based instead on its assertion that she received notice of the TOS through (1) the

12   confirmation email it sent, (2) the materials that Clearwire sent with its modem, and/or

13   (3) her access of the "I accept terms" page on Clearwire's website which Clearwire

14   asserts "presented her with the TOS."  (Clearwire Mot. at 9-10; Supp. Camacho Decl. ¶

15   6.)  Clearwire argues that Ms. Reasonover's notice of the TOS, through one and/or all of

16   these three devices, combined with her retention of the modem, renders her bound to the

17   terms of the TOS, including its arbitration provision.  (Clearwire Mot. at 9-10.)

18   First, for all of the reasons that the court found Clearwire's confirmation email to

19   Ms. Brown to be inadequate notice of the TOS, the court finds that it is inadequate notice

20   with respect to Ms. Reasonover as well.  Further, the materials that Clearwire included in

21   the modem packaging fare no better with respect to establishing Ms. Reasonover's assent.

22   There is no evidence before the court that Clearwire included the TOS itself in the

1    modem's packaging.  Rather, Clearwire has only submitted evidence that at the bottom of

2    one of the pages it included in the modem packaging was a reference to the TOS and to

3    where the TOS could be located on its website.  The statement actually contains reference

4    to two different hyperlinks.  Neither link, however, immediately displays the TOS.  The

5    first link requires the user to find and then click on an additional hyperlink, entitled

6    "Terms of Service."  If this hyperlink is clicked, then the TOS appears on the next

7    webpage.  (*See id.*)  The second link, which is Clearwire's homepage, requires a user to

8    click on two additional hyperlinks to find the TOS.  (*See id.*)  The court concludes, based

9    on the authorities described above, that inclusion of this notice in the modem's packaging

10   alone, without inclusion of the TOS itself, is inadequate notice to bind Ms. Reasonover

11   by reason of her retention of the modem.

12       Clearwire nevertheless asserts that Ms. Reasonover had notice of the TOS when

13   she accessed Clearwrie's website and was presented with the "I accept terms" page.  (*See*

14   Reply (Dkt. # 141) at 11-12.)  The court, however, is unwilling on the basis of a summary

15   judgment standard under which Ms. Reasonover must be given the benefit of all doubts

16   and inferences, *see Three Valleys Mun. Water Dist.*, 925 F.2d at 1141, to find that Ms.

17   Reasonover's mere access of the "I accept terms" page establishes that she had notice of

18   the TOS.  First, the two TOS assent pages that Clearwire has placed in the record as

19   "examples" of pages "used during the relevant time frames" do not appear to

20   immediately display the TOS.  (*See* Camacho Decl. Exs. A & B; Stip. ¶ 6.)  Instead, the

21   pages appear to require a user to either click on another hyperlink or scroll down an inset

22   page in order to view the TOS.  (*See* Camacho Decl. Exs. A & B.)  Ms. Reasonover has

ORDER- 21

1    never testified that she took any of these actions to view the TOS, but rather merely states

2    that she "abandoned" the page, "determining not to accept the terms and, instead, to

3    telephone Clearwire's service center . . . ."  (Reasonover Decl. ¶ 7.)  Further, there is no

4    specific evidence in the record establishing which of these pages Ms. Reasonover viewed,

5    or even that she viewed either one of these pages as opposed to some other page not yet

6    in the record.

7          Finally, there is no dispute that Ms. Reasonover specifically declined to press the

8    "I accept terms" button presented on Clearwire's webpage.  The court is skeptical of

9    Clearwire's position that, despite Ms. Reasonover's express decision not to press the

10   button, she nevertheless should be held to be bound by the TOS by virtue of her mere

11   access of the page and her retention of the modem.  This is particularly so when Ms.

12   Reasonover has testified that despite the fact that the modem never worked in her house,

13   Clearwire refused to allow her to return it.  Clearwire seems to want it both ways –

14   insisting that consumers be bound by the TOS when they click their consent, but refusing

15   to concede that they are not so bound when they specifically decline to do so.

16   Nevertheless, the court finds based on the record before it that there are genuine issues of

17   material fact concerning whether Ms. Reasonover had actual or constructive notice of the

18   TOS.  The court, therefore, denies Clearwire's motion to compel arbitration without

19   prejudice with respect to Ms. Reasonover, as well.  Accordingly, as required by the FAA,

20   9 U.S.C. § 4, the evidentiary hearing noted above will also address the factual issue of

21   Ms. Reasonover's actual or constructive notice of the TOS as indicated further below.

22

### C.  BOR's Motion to Compel Arbitration

BOR has also moved to compel arbitration on the basis of the arbitration provision contained within Clearwire's TOS.  The court has ruled that there are factual issues that must be resolved with respect to Clearwire's motion to compel arbitration of both Ms. Brown's and Ms. Reasonover's claims.  Thus, it is possible that, following an evidentiary hearing on the issues, the court will rule that Ms. Brown's and Ms. Reasonover's claims are subject to arbitration under the clause contained in the TOS.

There is no dispute that BOR is not a party to the TOS.  A contractual right to arbitration "may not be invoked by one who is not a party to the agreement and does not otherwise possess the right to compel arbitration."  *Britton v. Co-Op Banking Group*, 4 F.3d 742, 744 (9th Cir. 1993).  There are circumstances, however, such as under various agency and estoppel theories, in which nonsignatories to an arbitration agreement may compel arbitration against signatories or themselves be compelled to arbitrate by signatories.  *See Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006); *M.S. Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999); *Britton*, 4 F.3d at 744-46.  Agents of a signatory to an arbitration agreement can compel the other signatory to arbitrate so long as (1) the wrongful acts of the agents for which they are sued relate to their behavior as agents or in their capacities as agents, and (2) the claims against the agents arise out of or relate to the contract containing the arbitration clause.  *Amisil Holdings, Ltd. v. Clarium Capital Management*, 622 F. Supp. 2d 825, 831-33 (N.D. Cal. 2007) (relying upon *Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185 (9th Cir. 1986) and *Britton v. Co-op Banking Group*, 4 F.3d 742 (9th Cir. 1993)).

1    BOR has presented evidence that it acted as an agent of Clearwire at the time that

2  it made calls to Ms. Brown and Ms. Reasonover.  Plaintiffs, however, assert and present

3  evidence that the relationship between BOR and Clearwire was one of an independent

4  contractor.  If BOR's relationship was one of an independent contractor, then it cannot

5  compel Ms. Brown or Ms. Reasonover to arbitration on the basis of the arbitration clause

6  in Clearwire's TOS.  *See, e.g.*, *Swift v. Zynga Game Network, Inc.*, No. C-09-5443 EDL,

7  2011 WL 3419499, at * 12 (N.D. Cal. Aug. 4, 2011) ("Independent contractors do not

8  fall within the exception that non-signatory agents may be bound by an arbitration

9  agreement.").  The question of whether an entity is operating as an agent or an

10  independent contractor is ordinarily one of fact.  *Kelsey Lane Homeowners Assoc. v.*

11  *Kelsey Lane Co., Inc.*, 103 P.3d 1256, 1261 (Wash. Ct. App. 2005).

12    The court finds on the record here that there is an issue of fact concerning whether

13  the relationship between BOR and Clearwire was one of an independent contractor, or

14  whether it was the type of close agency relationship that would entitle BOR to enforce

15  the terms of Clearwire's arbitration clause against Ms. Brown and Ms. Reasonover.

16  Accordingly, the court denies BOR's motion without prejudice, and as required will

17  "proceed summarily to a trial" with respect to this issue.  *See* 9 U.S.C. § 4.  The court will

18  schedule the required evidentiary hearing with respect to the issue of BOR's relationship

19  with Clearwire, and its alleged right to enforce the arbitration agreement against Ms.

20  Brown and Ms. Reasonover, as indicated below.

21

22

1

### D.  Plaintiffs' Motion to Defer Ruling on the Motion to Compel Pending Further Discovery

After Defendants' motions to compel arbitration were fully briefed, Plaintiffs moved to defer ruling on the motions until further discovery had been conducted.  (*See* Plaint. Mot.)  Plaintiffs asserted that such discovery was necessary in light of the Supreme Court's ruling in *AT&T Mobility LLC v. Concepcion*, --- U.S. ---, 31 S.Ct. 1740 (2011).  (Reply (Dkt. # 158).)  The court has now denied Defendants' motions to compel arbitration without the necessity of reaching the issues implicated by the Supreme Court's recent ruling in *Concepcion*.  Accordingly, the court denies Plaintiffs' motion as moot.

### IV.  CONCLUSION

Based on the forgoing, the court DENIES Clearwire's motion to compel arbitration without prejudice (Dkt. # 127).  The court also DENIES BOR's motion to compel arbitration without prejudice (Dkt. # 126).  Finally, the court DENIES Plaintiffs' motion to defer the court's ruling with respect to Defendants' motions to compel arbitration as MOOT (Dkt. # 153).

The court further ORDERS Ms. Brown, Ms. Reasonover, Clearwire and BOR to submit a joint status report within 14 calendar days of this order stating the number of days they seek with respect to the evidentiary hearings noted above, the timeframe in which the parties seek to conduct the hearings, the number of witnesses each party intends to call, along with a statement concerning other evidence the parties intend to

1  present.  After receiving the parties' joint status report, the court will schedule the

2  necessary hearing.

3         Dated this 28th day of December, 2011.

4

5

6         _____

7         JAMES L. ROBART
           United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 26